873 P.2d 1343

**Diane K. MECKLING, Fred Forrest Meckling, husband and wife, and Kristopher Todd Meckling, their minor child and Kent Forrest Meckling, individually, Plaintiffs–Appellants,**

v.

**Virginia FONTES and John Doe Fontes, Corporations Y, and Z, and Does I Thru X, Defendants–Respondents.**

No. 19942.

Court of Appeals of Idaho.

May 3, 1994.

Houst, Carty & Dredge, Boise, for plaintiffs-appellants. Richard K. Dredge, argued.

Elam & Burke, P.A., Boise, for defendants-respondents. Bobbi K. Dominick, argued.

SWANSTROM, Judge, Pro Tem.

In an action brought to recover damages for personal injuries from an accident caused by the defendant's negligence, the jury found that the plaintiffs suffered no damages as a result of the accident. The district court later denied the plaintiffs' motions for a new trial under I.R.C.P. 59(a), or alternatively for judgment notwithstanding the verdict under I.R.C.P. 50(b). The plaintiffs appeal, contending that the court should have granted their motion for a new trial because the evidence was not sufficient to justify the verdict awarding no damages, I.R.C.P. 59(a)(6), and it appeared that the verdict was given under the influence of passion or prejudice, I.R.C.P. 59(a)(5). For the following reasons, we affirm.

On a Saturday morning, September 10, 1988, the plaintiff, Diana Meckling was a passenger in the front seat of a Volvo automobile being driven by her husband, Fred Meckling. While momentarily stopped at a red light in the City of Boise the Volvo was bumped from behind by an Arias automobile driven by the defendant, Virginia Fontes. Before the accident, Fontes had been driving in the same lane behind another car, approaching an intersection, when she noticed that car had keys dangling from the trunk lock. When that car moved into the left turn lane Fontes moved alongside trying to tell its occupants about the keys. She testified that while so engaged she had her foot on the brake pedal and "was just creeping along" when she hit the car in front of her. This evidence, construed most favorably in support of the jury's verdict, shows that it was a low impact accident. The bumpers of the two cars met. No damage occurred to Mrs. Fontes' Arias. The only damage to the Mecklings' Volvo was a cracked taillight cover. The bulb behind the cover was not broken.

Neither Mr. Meckling nor Mrs. Fontes was injured in any way. The two drivers got out of their vehicles, briefly looked for damage, exchanged information about their identities and insurance. Mrs. Fontes apologized for causing the accident and offered to pay for the broken taillight.

Mr. Meckling testified that his car was more than "bumped." He testified that as he was waiting for the intersection light to turn green he noticed in the rear view mirror that Fontes' car was approaching and was going to hit them. He had his foot on the brake and he pressed the brake harder and braced himself just as they received a "real jolt." His head was "popped" against the head rest. He admitted, however, that the car was not knocked forward by the impact. The cars were impeding traffic and, after talking to Mrs. Fontes and viewing the damage, he decided that it was not necessary to call the police. When he returned to his car and drove away, his wife complained of a severe headache and neck pain.

Mrs. Meckling testified that when the accident occurred she was turned to her left in the passenger seat talking to her husband. The unexpected impact slammed the left side of her head into the headrest and she bounced forward against the shoulder harness. Almost immediately, she began to experience a severe headache and neck pain. She complained of the pain to her husband while they were at the scene of the accident, and she testified that she remained in the car. However, they continued on with an errand before returning to their home. She did not seek any medical assistance on the day of the accident.

The evidence further showed that on the evening of the accident Mr. and Mrs. Meckling drove from Boise to Caldwell to attend a school function with their children until after 10:30 p.m. On Monday, two days after the accident, Diana returned to her employment. When her husband prompted her—after talking to their insurance agent—to see her doctor, she made an appointment for Tuesday.

Based on Diana's report of the accident and on her report of continuing head and upper body pain and stiffness, her doctor (Dr. Stackle) diagnosed a "whiplash-type of injury where the head had been thrust forward and backward." He prescribed an anti-inflammatory medication and a muscle relaxer. He had subsequent appointments with her on September 20, October 11, and on November 2. During this time, Mrs. Meckling continued to complain of severe headaches. As a result, in October, Dr. Stackle arranged an appointment with a neurosurgeon, Dr. Jutzy, for a more specialized examination and a second opinion. Although Diana Meckling testified that she continued to suffer severe headaches following the accident, she did not miss any work during 1988 and 1989. In April 1990 she missed eight hours of work because of further medical tests and procedures, (cervical myelogram, X–Rays and CAT scan).

Part of Dr. Jutzy's initial examination in October, 1988, included a magnetic resonance imaging scan (MRI). Dr. Jutzy found that Mrs. Meckling's spinal canal in the cervical (neck) area was more narrow than normal, and that this condition (stenosis) was congenital. He testified that "a very minor disturbance that might not affect some other person would be more likely to affect someone with stenosis because there's no room for the spinal cord or the nerve roots to move if anything enters the canal or pushes in on the canal." He also found in the cervical spine at the space between the 6th and 7th vertebrae a disk herniation, or bulging of the disk, which was pushing the spinal cord against the back wall of the spinal canal. Finally, the MRI revealed one other notable condition at the top of the spinal canal involving the cerebellum which later proved to be a normal condition unrelated to the accident. Dr. Jutzy testified:

> The findings on this [October 1988] MRI scan are rather nonspecific, and they can be caused by normal wear and tear of somebody Diana's age as she presented. Or particularly the C–6/7 disk hernia could be related to the automobile accident.

Dr. Jutzy testified that, following these tests, his "working diagnosis was that she had a muscle and ligament stretching injury to her neck." He treated this conservatively to control pain, muscle spasm and inflammation.

Over the next year and a half, Mrs. Meckling continued to seek relief from headaches and other symptoms which, at times, were reported to her doctors to be worse than they were right after the accident. In April 1990, Dr. Jutzy obtained another MRI scan report, a myelogram and a CAT scan. These tests revealed that there was further disk

involvement in the cervical spine, causing a slight deformation of the spinal cord. Two additional disks showed herniation which had occurred since the first MRI was taken. Although Diana was "having new onset of pain down the left arm," Dr. Jutzy and Diana did not believe that surgery "was absolutely necessary at that point in time."

In January 1991, Diana fell in the parking lot at her place of employment, suffering both lower and upper spinal injuries which, for a time at least, caused pain in her lower back and her extremities. Her neck and head pain persisted after this accident. Dr. Jutzy noted also a weakness in the triceps and in the hand grip on the left side. In May, 1991, Dr. Jutzy performed spinal surgery to relieve pressure on nerve roots in the neck caused by the disk injury and a bone spur, both of which he related were the probable result of the automobile accident of September 10, 1988. He testified that the lower back injuries were not related to the accident.

■ In rebuttal to this evidence, the defense called another neurosurgeon, Dr. Asher. Dr. Asher did not disagree that Mrs. Meckling had herniated disks in the neck accompanied by osteophytes (bone spurring) which justified the surgery performed by Dr. Jutzy to relieve pressure on the spinal cord and irritation of nerve roots. However, Dr. Asher testified that, in his opinion, these conditions were not due to any trauma caused by the accident, but rather to a "degenerative cervical osteoarthritis" "in the setting of a congenitally narrowed spinal canal" in the vertebrae of the neck. He noted the confirming presence of the osteoarthritis in the lower back, as well. He did not, however, testify that the minor automobile accident caused no injury to Mrs. Meckling. He merely testified circumspectively that:

> [t]he sequence of medical events subsequently, to my way of thinking and to my reviewing these records, suggest that there was some what's commonly called myofascial pain, soft-tissue pain, following

the impact and following the accident. That has intermittently been present for over these many months subsequently.

In all of Dr. Asher's testimony, this is as close as he came to conceding that the accident caused some soft-tissue injury, which would not be revealed by the sophisticated tests used in this case. He was neither asked specifically, nor did he state his opinion as to whether the accident caused that limited kind of injury. He did note the symptoms of "soft-tissue pain and muscle spasm more in the neck and shoulder, proximal shoulder regions," described in one chart he examined. As to those symptoms, he testified:

> That's a soft-tissue pain condition which is a not-uncommon presentation of degenerative arthritis in the neck. No different, for example, from that in the low back.

Dr. Asher was asked for his opinion about the length of time for full recovery from soft-tissue injuries caused by trauma, to which he answered:

> Recovery in this circumstance can be quite variable. But assuming that an individual comes in, for example, with tight muscles and restricted movement, if attended to early, as was the case here, the natural history of that condition is one of improvement over, I would say, two to four months.

In ruling on the plaintiffs' motion for J.N.O.V., the district court first found that in returning its unanimous "no damages" verdict, the jury "apparently relied substantially on the testimony of Dr. Asher ... [whose] testimony, in substance, was that the various physical ailments complained of by Diana was [sic] caused by degenerative osteoarthritis. The complaint of organic brain injury was not consistent with a low-impact accident."[1] The district court went on to conclude that, "[b]ased upon Dr. Asher's testimony and the medical records of the Plaintiff, this Court determines there was substantial evidence for the jury to determine

---

1. In two findings the district court referred to Diana's claim for "organic brain" injury or damage. No such claim was made. The only mention of a possible brain injury was by Dr. Jutzy

and Dr. Asher in discussing an aspect of the brain stem as shown by one of the MRI scans. In this respect, the court's findings are unnecessary and erroneous.

there were no damages as a result of the September 10, 1988 incident."

To the extent that the district court believed that Dr. Asher had testified that the accident did not cause *any* soft-tissue injuries, we must disagree. Dr. Asher's opinions—at least the ones he expressed at trial—did not go that far. It was error for the district court to say that "based upon Dr. Asher's testimony and the medical records of the Plaintiff, this Court determines there was substantial evidence for the jury to determine there were no damages as a result of the September 10, 1988 incident." We must hold that Dr. Asher *neither conceded nor denied* that the accident caused "some" soft-tissue injury and pain to Mrs. Meckling. Nevertheless, Dr. Asher's testimony did give the jury sufficient evidence from which they could conclude that most, if not all, of the pain and injuries claimed by Mrs. Meckling were due to other causes, rather than to the accident.

In this appeal, the Mecklings acknowledge that the jury might have been justified in accepting Dr. Asher's testimony that Diana's continuing pain and other symptoms following the accident, and the surgery which was performed to alleviate these symptoms, were due to her congenital stenosis and to degenerative osteoarthritis, rather than being caused by the accident. But the Mecklings argue that the testimony of Dr. Stackle and Dr. Jutzy and Diana's own testimony were undisputed that she did indeed suffer some soft-tissue injury as a result of the accident, with resulting damages for medical treatment of this injury, and damages for pain and suffering occurring for some period of time following the accident. Therefore, they maintain that the jury was not justified in totally denying her claim for damages for *those injuries. We will address this point* later.

█ The Mecklings further contend that Fontes' counsel, in her closing argument to the jury, conceded that some injury resulted from the accident caused by Fontes. Counsel told the jury that her client was negligent in bumping into the Mecklings' car. She went on to say:

Now you need to determine what damages were caused by that accident. Now, I think the testimony is clear that there was a muscle strain … I would not try to tell you that a person could not receive a muscle strain in an accident. I think it can happen.

Counsel then asked the jury to differentiate between injury caused by the accident and conditions which were caused by degenerative osteoarthritis, conditions which would have occurred regardless of the accident. She told the jury what she thought, based on the evidence, might be appropriate damages for any injury and for medical expenses related to the accident. This argument urged the jury to be fair and reasonable and in no way did it impugn the character of the plaintiffs or otherwise appeal to anyone's passions or prejudices. Regardless of the choice of words counsel used in her argument on damages, the statements of counsel were not "evidence" which can be used to determine whether the jury's verdict was proper. We hold that these statements provide no grounds for overturning the jury's verdict.

In summary, we agree with the Mecklings that there was sufficient competent medical evidence to support Diana's testimony that she suffered "some" soft-tissue injury as a result of the auto accident. On the other hand, the testimony of the defendant's expert witness, Dr. Asher, did not provide a basis for the court to say there was "substantial evidence for the jury to determine there were *no* damages" from the accident. Thus, there was no direct contradiction of the plaintiff's evidence of "some" temporary soft-tissue injury, although plaintiff's claims of other extensive permanent injuries were persuasively contradicted by Dr. Asher through medical records introduced at trial.

The evidence of immediate soft-tissue injury from the accident depended ultimately upon the testimony of Diana Meckling. The evidence was entirely subjective because, unless soft-tissue injuries are severe, they are not objectively observable or detectable even with the aid of sophisticated tests. Headaches, neck pain and stiffness were the principal complaints following the accident. The diagnosis of a "whiplash type" of injury was

dependent upon these subjective complaints following a low impact rear-end collision. In short, if the jury found Diana's testimony to be credible, it would follow that she was entitled to some damages for the injury and for the related medical expenses. *See, e.g., Smith v. Idaho State University Federal Credit Union,* 114 Idaho 680, 685, 760 P.2d 19, 25 (1988), holding that the trier of the facts "must accept as true the positive, uncontradicted testimony of a credible witness, unless his or her testimony is inherently improbable, or is rendered so by facts and circumstances disclosed at trial." Our inquiry ultimately comes down to whether the jury's verdict can be justified under these circumstances.

The district judge's findings did not evaluate or discuss any witness's credibility, although he could have done so in ruling on the post-trial motions if he had felt it necessary. Regardless, it is apparent that the district judge had no hesitancy in accepting Mrs. Fontes' version of the accident and other evidence showing that the accident produced almost no impact. Indeed, some discrepancies in the testimony about the accident could have created doubts in the jurors' minds about the credibility of the plaintiffs, whether those doubts were deserved or not. We have no reason to believe, however, that those doubts arose from passion or prejudice on the part of the jurors.

■ Based on the medical testimony and other evidence presented, the jury could easily have concluded also that Mrs. Meckling exaggerated the injuries she claimed to have been caused by the accident, and that the Mecklings were over-reaching in the damages sought. The credibility of the plaintiffs was put in issue by inconsistent testimony and by other contradictory evidence presented. However, only by totally rejecting Mrs. Meckling's testimony about the symptoms she said she first experienced immediately following the accident could the jury find that she suffered "no damages" as a result of the accident. Dr. Asher's testimony did not preclude the jury from having that option, but neither did his testimony provide substantial evidence that "no damages" resulted from the accident. However, the weight to be given to all of the evidence was a matter solely within the province of the jury. *See, e.g., Masters v. Dewey,* 109 Idaho 576, 709 P.2d 149 (Ct.App.1985); *Preuss v. Thomson,* 112 Idaho 169, 730 P.2d 1089 (Ct.App.1986). In each case, the jury's verdict finding no damages for personal injury arising from rear-end collision was upheld.

Based on the record we have reviewed, we cannot conclude that the verdict of "no damages" must be set aside. Although there was substantial competent evidence to support an award of some damages for soft-tissue injuries, the jury was not bound to accept as credible the testimony which, if believed, would have established those injuries. Accordingly, we are constrained to affirm the district court's order which denied a new trial and a J.N.O.V. We award costs to the respondent, Fontes, but no attorney fees on appeal.

WALTERS, C.J., and SILAK, Acting Judge, concur.